**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| REMBRANDT VISION TECHNOLOGIES, L.P., § <br> Plaintiff, § <br> § <br> v. § <br> § <br> BAUSCH & LOMB, INC., ET AL., § <br> Defendants. § | § CIVIL ACTION NO. 2-05-CV-491 (TJW) |

**MEMORANDUM OPINION AND ORDER**

After considering the submissions and the arguments of counsel, the Court issues the following order concerning the claim construction issues:

**I.   Introduction**

Plaintiff Rembrandt Vision Technologies, Inc. accuses Defendants Bausch & Lomb, Inc. ("Bausch & Lomb") and CIBA Vision Corp. ("CIBA") of infringing United States Patent No. 5,712,327 ("the '327 patent") entitled "Soft Gas Permeable Contact Lens Having Improved Clinical Performance." The plaintiff has asserted claims 1, 2, 7, 8, 10, and 11 against Bausch & Lomb and claims 1, 2, 6, 7, 8, 10, 11, 13, and 14 against CIBA.

**II.   Background of the Technology**

The '327 patent discloses a soft gas permeable contact lens that substantially improves upon the clinical performance of prior soft gas permeable contact lenses, and a method for manufacturing the improved contact lens. Generally, contact lenses need to be substantially permeable to oxygen and have a highly wettable and deposition-resistant surface. Previous soft gas permeable lenses had excellent oxygen permeability and hydrophilicity, but were not suitable for extended wear due to poor wettability, deposition resistance, and dehydration resistance. To resolve these issues, the '327

patent describes a hydrophilic soft gas permeable contact lens with a surface layer that has a higher proportion of hydroxy acrylic units to silicon units compared to the existing lens core. This type of contact lens was designed to be worn for an extended period of time.

### III. General Principles Governing Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. A patent's claims must be read in view of the specification, of which they are a part. *Id*. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id*. "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although

the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (emphasis added) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id*. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id*. at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. The patent is addressed to and intended to be read by others skilled in the particular art. *Id*.

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id*. at 1315 (*quoting Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for

construing the claims. *Id*. at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id*. Nevertheless, the prosecution history is intrinsic evidence. That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193

(Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Id*. at 1319-24. The approach suggested by *Texas Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id*. at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id*. What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id*. The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id*. at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant. The court now turns to a discussion of the disputed claim terms.

**IV.    Terms in Dispute**

Claims 1 and 7 of the '327 patent are representative of how the terms in dispute are used in

the asserted claims. Claim 1 is an independent apparatus claim. It provides:

> A hydrophilic soft gas permeable contact lens comprised of a polymerization product of a composition comprising a polymerizable vinylic siloxane monomer and a hydrophilic vinylic monomer, and having at least 25% water by weight and characterized by high oxygen permeability, softness, rebound elasticity and a high degree of clinical performance, said lens comprising a hydrophilic lens body and a tear-wettable surface layer integral therewith, said lens body being comprised of said polymerization product and said tear-wettable surface layer being comprised of polymeric material containing hydroxy acrylic monomer units, and wherein the proportion of hydroxy acrylic monomer units to silicon units in said tear-wettable surface layer is greater than that of said lens body.

Claim 7 is an independent method claim. It provides:

> A method for making a hydrophilic soft gas permeable contact lens having improved clinical performance, said method comprising the steps of:
> (a) forming a hydrophilic soft gas permeable contact lens body having at least 25% water by weight and comprised of a polymerization product of a composition comrpising a polymerizable vinylic siloxane monomer and a hydrophilic vinylic monomer; and
> (b) reacting said lens body with a member selected from the group consisting of (I) a polyol of the formula $R_1(OH)_n$, wherein $R_1$ is a substituted or unsubstituted alkyl and n is an integer of at least 2, and (ii) hydroxy acrylic monomer, to provide on said lens body a surrounding tear-wettable surface layer integral therewith, said surface layer being comprised of polymeric material containing hydroacrylic monomer units, and wherein said tear-wettable surface layer has a proportion of hydroxy acrylic monomer units to silicon units greater than that of said lens body.

### A. Agreed Constructions

The parties have stipulated to the construction of the following term in the claims:

"Rebound elasticity" means "the contact lens when hydrated has enough resilience to recover its shape after being deformed."

### B. Disputed Constructions

#### 1. "Hydrophilic lens body"

The plaintiff proposes "a lens body, which is the interior core portion of a contact lens, that

is capable of attracting and absorbing water." The plaintiff claims that "hydrophilic" in this context means "capable of attracting and absorbing water." The defendants propose "the hydrophilic core lens which, in a hydrated state, prior to surface treatment has an already highly hydrophilic surface as measured by the advancing contact angle measurement." The defendants claim that "hydrophilic" means "having a surface having an affinity for water as measured by the advancing contact angle measurement." The main disputes are 1) whether "lens body" includes the surface and 2) whether the hydrophilic nature of the lens body needs to be determined by the contact angle measurement.

The defendants argue that the "lens body" includes the surface because the invention is directed to contact lenses already having hydrophilic surfaces. *See* '327 patent, 2:59-65. The defendants also contend that the '327 patent only describes contact angle as a means for determining the hydrophilicity of the contact lens surface. '327 patent, 3:11-13. The defendants point to extrinsic evidence to show that contact lens practitioners measure wettability through the contact angle.

Although the invention is directed to contact lenses with hydrophilic surfaces, the claim refers to a contact lens having two structures, a "hydrophilic lens body" and a "tear-wettable surface layer." '327 patent, 8:8-9. In addition, the intrinsic evidence does not support placing a contact angle limitation for measuring wettability. The patent specifically states that *an example* of acceptable wettability is determined based on contact angle. '327 patent, 3:11-13.

The Court construes "hydrophilic lens body" to mean "a lens body, which is the interior core portion of a contact lens, having an affinity for and capable of absorbing water."

    **2.**    **"Monomer"**

The plaintiff proposes "a molecule that is capable of being chemically reacted with other

molecules to form a larger molecule, such as a polymer." The defendants propose "a molecule that is capable of combining with like or unlike molecules to form a polymer. It is a repeating structure or unit within a polymer."

The Court construes "monomer" to mean "a molecule capable of being combined with other molecules to form a polymer."

### 3. "Units"

The plaintiff proposes "the structural monomeric units or the number of atoms, including those as part of an overall copolymeric structures." The defendants propose "structural monomeric units or the number of silicon atoms."

Both parties agree that this term is expressly defined in the specification. The specification states that "the units referred to are the structural monomeric units or the number of silicon atoms, including those as part of an overall copolymeric structure." '327 patent, 4:4-7. The plaintiff excludes "silicon" from its definition because the specification distinguishes between "silicon units" and "monomer units." *See* '327 patent, 4:2-3. The defendants, on the other hand, contend that "including those as part of an overall copolymeric structure" is exemplary language and should not be included in the definition.

The Court agrees with the plaintiff. Claim 1 distinguishes between silicon and monomer units. '327 patent, 8:13-15. Accordingly, the Court adopts the plaintiff's proposed construction.

### 4. "Having at least 25% water by weight"

The plaintiff proposes "25% or more of the weight of the contact lens in its hydrated state (at equilibrium conditions) is water." The defendants propose "the claimed lens has at least 25% by weight as measured by a method understood by one of ordinary skill in the art through reading the

patent specification." The dispute is how one measures "25% water by weight."

The defendants argue that, at the time of the invention, there were several methods to calculate water weight and any of these methods could be used to measure the water content. The plaintiff, on the other hand, argues that the method of measuring water content is known in the art and, therefore, it is inappropriate to include a method of measuring water weight into the definition. Furthermore, according to the plaintiff, the various methods of measuring water weight substantially provide the same results.

It is unnecessary to include a limitation that the weight is measured "by a method understood by one of ordinary skill in the art." In addition, the defendants do not appear to dispute that one of ordinary skill in the art would understand that the percentage of water weight is measured at equilibrium conditions.[1] Accordingly, the Court adopts the plaintiff's proposed construction.

### 5. "Softness" and "soft"

The plaintiff proposes "the contact lens when hydrated has flexibility, which permits the lens to contour itself to the shape of an eye." The defendants propose "having a Shore D hardness of less than 1." The defendants contend that the patentee defined the term in the prosecution history. In response to a rejection, the applicant stated that "'hard' and 'soft' are not relative terms but are real different words as illustrated below." Patent Appl. 07/132,174, Response to Office Action, March 4, 1989, at 1. In the illustration, the applicant shows that, on a Hardness Scale (Shore D), hard contact lenses are greater than 80 and soft contact lenses are less than 5. *Id*. It also shows that the range between 5 and 80 is "useless" for both hard and soft lenses. *Id*. In another response to a

---

[1] A contact lens in its hydrated state at equilibrium condition usually occurs when the lens is immersed in saline solution at a constant temperature for a minimum of one hour. *See* Plaintiff's Claim Construction Brief, Ex. 9, ISO PROPOSED STANDARD (1989), at 3.

rejection, the applicant again illustrated the difference between hard and soft contact lenses, where hard contact lenses had a Hardness (Shore D) of greater than 80 and soft contact lenses were less than 1.  Patent Appl. 07/545,205, Response to Office Action, March 21, 1992, at 1.

The plaintiff, on the other hand, argues that these statements were not intended to define "softness," but were used as examples to educate the examiner.  *See* Patent Appl. 07/551,156, Response to Office Action, April 20, 1992, at 13.  The plaintiff also argues that there was no clear intent to redefine the ordinary meaning of the terms.

The terms "soft" and "softness" as used in claim 1 convey two different meanings.  The Court will first address the construction of "soft."  Specifically, the Court will construe the entire phrase "soft gas permeable contact lens."  The invention of the '327 patent focuses on improving existing soft contact lenses.  '327 patent, 1:14-17.  The applicant distinguished prior art related to hard contact lenses by stating that, in the contact lens industry, soft contact lenses have a Hardness (Shore D) of less than five.  Patent Appl. 07/132,174, Response to Office Action, March 4, 1989, at 1.  The applicant also stated that a major difference between hard and soft contact lenses is that soft contact lenses (including soft gas permeable lenses) have a Hardness (Shore D) of less than one.  Patent Appl. 07/545,205, Response to Office Action, March 21, 1992, at 1.  One of ordinary skill in the art, therefore, would understand that a soft contact lens has a Hardness (Shore D) no greater than five.  There was, however, no clear intent by the applicant to limit soft contact lenses to a Hardness (Shore D) of less than one.  Accordingly, the Court construes "soft gas permeable contact lens" to mean "a contact lens having a Hardness (Shore D) of less than five."

The Court will now address the term "softness."  As stated in claim 1, the contact lens is "characterized by . . . softness . . . ."  The prior art referenced in the specification characterizes soft

contact lenses as those contact lenses that are flexible enough to shape to the contours of the eye. *See* 4,486,577 patent, 1:36-37; 4,711,943 patent, 3:10-25. The Court construes the term "softness" to mean "having flexibility when hydrated to shape to the contours of the eye."

### 6.     "A high degree of clinical performance"

The plaintiff proposes "the contact lens has functional wettability, dehydration resistance, deposition resistance, and comfort, rendering the lens suitable for extended wear." The defendants propose "clinical performance, resulting from the lens having a sufficiently high proportion of HAM units to silicon units on the lens surface, that is a significant improvement over the clinical performance of the untreated lens body."

The plaintiff's construction comes from the specification describing examples of clinical performance. *See* '327 Patent, 1:63-2:6. The plaintiff contends that the defendants' construction improperly incorporates structural limitations into a functional limitation. The defendants argue that the "high degree of clinical performance" is based on the structural invention, and, therefore, the structure must be included in the definition.

The defendants also dispute the inclusion of "extended wear" in the plaintiff's proposed construction. According to the defendants, the specification does not require clinical performance to have extended wear capabilities and if the patentee wanted to limit the claim term to "extended wear," he could have explicitly done so.

The defendants attempt to import limitations from the preferred embodiment. A "high degree of clinical performance" is the benefit achieved by the structure disclosed in the '327 patent. This does not mean that the Court's construction must include the structure as suggested by the defendants. Furthermore, throughout the specification, "clinical performance" is associated with the

ability to wear the lenses for a long period of time. *See* '327 Patent, 2:1-6, 6:6:35-39, 6:45-50. Accordingly, the Court construes the term to mean "a contact lens that has functional wettability, dehydration resistance, deposition resistance, and comfort, rendering the lens suitable for extended wear."

### 7. "Tear-wettable surface layer"

The plaintiff proposes "a surface layer, as defined below, which has an outermost surface on which tear fluid has a tendency to spread when it contacts that surface. Further, "surface layer" means "the exterior portion of a contact lens that is chemically distinct from the lens body. This layer extends from the outermost surface of the contact lens to a depth in the lens where the composition, including proportion of components, becomes substantially the same as the overall composition of the lens body. A contact lens that has substantially the same overall polymer composition does not contain a surface layer under this definition, even though part of the polymer can re-orient in response to certain environmental conditions." The defendants propose "a layer which covers the entire lens body, which has a measurable thickness and which has a surface that is contacted by the tear layer and which has a high affinity for the tear layer." The Court will construe the phrase as two separate terms, "tear-wettable" and "surface layer."

#### a. "Tear-wettable"

The parties dispute whether this term means "a high affinity for" tears or whether it means that tear fluid spreads out when exposed to a surface. The plaintiff contends that "tear-wettable" means "tear fluid has a tendency to spread out when exposed to a surface." According to the plaintiff, its construction is the meaning understood by one of ordinary skill in the art in the context of this patent. The defendants argue that "tear-wettable" requires that tears directly contact the

surface layer and, therefore, the surface layer must have a high affinity for tears. In the context of this patent, the Court adopts the plaintiff's construction of "tear-wettable."

### b. "Surface layer"

The prosecution history provides the proper guidance for construction of this term. The relevant portion of the prosecution history reads

> [I]n applicants' invention there is justification for describing the overall lens as having a "body" portion and a "surface layer" because their compositions actually differ. The "surface layer" is simply any layer beginning from (i.e., including) the outermost surface and moving inward to any arbitrary depth of the lens, with the "body" of the lens just being all the remainder of the lens. Amendment, April 20, 1992, at 8-9.

There is nothing in the intrinsic evidence that requires the "surface layer" to cover the entire lens body or to have a "measurable thickness." Accordingly, the Court construes "surface layer" to mean "a layer beginning from, and including, the outermost surface and moving inward to an arbitrary depth of the lens, and having a different composition from the 'body' portion of the lens."

### 8. "Integral therewith"

The plaintiff proposes "the tear-wettable surface layer is bound to, or otherwise connected to, the lens body so as to not easily separate from it." The defendants propose "the tear-wettable surface layer and the hydrophylic lens body directly contact each other and are affixed to each other to form the contact lens."

The Court construes the term to mean "the tear-wettable surface layer is bound or affixed to the lens body." The Court incorporates by reference its construction of "tear-wettable" and "surface layer."

### 9.  "Hydroxy acrylic monomer" and "Hydroxy acrylic monomer units"

#### a.  "Hydroxy acrylic monomer"

Both parties agree that this phrase corresponds to the following formula:

$$\begin{array}{c} \text{H}_2\text{C}=\text{C}-\text{C}=\text{O} \\ \phantom{\text{H}_2\text{C}=}|\phantom{-\text{C}}| \\ \phantom{\text{H}_2\text{C}=}\text{R}\phantom{-\text{C}}\text{X} \end{array}$$

The parties also agree that the term (also known as HAM) is defined in the specification. '327 patent, 4:8-22. Both parties, however, have added additional language in their proposed constructions. The plaintiff has added two explanatory sentences to set forth the definitions of "(unsubstituted) alkyl group" and "substituted alkyl group." The defendants argue that there is no intrinsic support for further explanation of terms.

The defendants' proposed construction adds further limitation based on other portions of the intrinsic record. The defendants add a limitation that HAM units must be hydrophilic. The defendants contend that the specification states that the purpose of the HAM units is to improve wettability, which means that the HAM units must be hydrophilic. The plaintiff, however, argues that the definition of HAM in the specification encompasses unsubstituted alkyl groups which are known to be hydrophobic, and, therefore, HAM units may be hydrophobic.

The defendants add another limitation that HAM units do not include polymerizable vinylic siloxane monomers (or PVS monomers). The plaintiff, however, contends that the specification states that a HAM unit may contain a substituted alkyl in the X group where the substituent contains a siloxanyl (Si-O) group, which would constitute a PVS monomer. According to the plaintiff, this means that HAM units encompass PVS monomers.

The Court agrees with the plaintiff that the term should be construed as described in the

14

specification. "Hydroxy acrylic monomer" means "a molecule corresponding to the following formula:

$$H_2C=C-C=O$$
$$\quad\quad\;|\;\;|$$
$$\quad\quad R\;X$$

wherein R is H or a substituted or unsubstituted alkyl; and X is a radical selected from the group consisting of hydroxyalkyloxy, hydroxalkyl amine, and hydroxy; with the alkyl being substituted or unsubstituted, and with the hydroxy on the alkyl being either a single hydroxy or a multiple hydroxy. An (unsubstituted) alkyl group is a hydrocarbon molecule containing only carbon and hydrogen atoms (C and H). A substituted alkyl group has an atom or group of atoms replaced by one or more different atoms or groups."[2]

### b.    "Hydroxy acrylic monomer units"

For "hydroxy acrylic monomer units," the defendants propose the same construction as "hydroxy acrylic monomer" while the plaintiff proposes "chemical structures that are part of a polymer and correspond to the structures of hydroxy acrylic monomers in polymerized form, an example of which is shown below. The R and X in the formula are as defined above and may also be sites through with the monomer units are connected to the polymer:

$$\quad\quad\;\;\;|$$
$$-H_2C-C-C=O$$
$$\quad\quad\;|\;\;|$$
$$\quad\quad R\;X$$

The Court agrees with the plaintiff that monomer units are part of a polymer and that the structure shown by the plaintiff is a more appropriate representation of the HAM unit as part of a

---

[2] The defendants appear to only dispute the inclusion of the plaintiff's explanatory language, but not its accuracy.

larger polymer molecule. Accordingly, the Court adopts the plaintiff's proposed construction.

### 10.   "Wherein the proportion of hydroxy acrylic monomer units to silicon units in said tear-wettable surface layer is greater than that of said lens body"

The plaintiff proposes "the proportion of hydroxy acrylic monomer units to silicon units is higher in the tear-wettable surface layer than in the lens body." The plaintiff also proposes that "silicon units" means "silicon atoms that are part of a polymer." The defendants propose "a ratio of HAM units to silicon atoms in the tear wettable surface layer greater than the ratio of HAM units to silicon units in the lens body which converts a clinically unacceptable lens to a lens having a high degree of clinical acceptability. The ratio of HAM units to silicon units in the tear wettable surface layer must be sufficient to convert a clinically acceptable lens to a lens having a high degree of clinical acceptability."

The defendants contend that the proper construction must recognize the relationship between the proportion and the high degree of clinical acceptability. The defendants also contend that the specification states what proportion is acceptable (e.g., 0.5) and what is not acceptable (e.g., 0.15). '327 Patent, 6:30-50. The defendants argue that their construction simply excludes subject matter that does not work.

The defendants attempt to limit the construction to a preferred embodiment. Accordingly, the Court adopts the plaintiff's proposed construction.

### 11.   "Hydroxyalkyl acrylate" or "hydroxyalkyl methacrylate"

The plaintiff proposes that "hydroxyalkyl acrylate" means "a type of hydroxy acrylic monomer unit where R may be a hydrogen atom (H) and where X is a hydroxyalkyloxy radical. Like other HAM units, X may have a substituted or unsubstituted alkyl as part of it and may also include

more than one hydroxyl group. X may also be a site through which the monomer unit is connected to the polymer."[3] The defendants propose "a hydroxy acrylic monomer unit having a hydrocarbon group with 10 or fewer carbon atoms and at least one hydroxy group."

The plaintiff argues that the defendants' proposal limits the construction to the preferred embodiment. The plaintiff also argues that the defendants' construction fails to capture the fact that the alkyl in the X group may be substituted and would constitute a non-hydrocarbon. The defendants argue that the applicants did not provide a description to include a hydroxyl alkyl having an unlimited number of carbon atoms and, therefore, one of ordinary skill in the art would understand that the applicant limited to carbon chain to 10 or fewer carbon atoms. The Court has considered the parties' positions and adopts the plaintiff's proposed constructions for both terms.

### 12. "Reacting said lens body with a member selected from the group consisting of"

The plaintiff proposes "the lens body undergoes a chemical reaction that involves one of the molecules in the defined group." The defendants propose "allowing the lens body and the member to interact in a manner to combine the member with the lens body, for example by chemical bonding to create a tear wettable surface layer on the lens body."

The plaintiff contends that the specification discloses a chemical reaction to alter the surface of the lens, and does not simply involve "combining" with the lens body. Therefore, according to the plaintiff, the defendants' construction excludes a preferred method. The defendants argue that "combining" encompasses all the preferred embodiments.

---

[3] Hydroxyalkyl methacrylate is a subset of hydroxy acrylic monomer units. The parties appear to agree that it should have the same construction as hydroxyalkyl acrylate except that R should be defined as a methyl group ($-CH_3$).

In the Court's view, the defendants' proposed construction would exclude a preferred embodiment. *See* '327 Patent, 4:46-64. It is therefore rejected. "Reacting said lens body with a member selected from the group consisting of" means "the lens body undergoes a chemical reaction with a member selected from the group consisting of."

### 13.   "Surrounding"

The plaintiff proposes "extending around." The defendants propose "covering the entire lens body." The plaintiff argues that its proposal is consistent with the commonly understood meaning of the term and that the defendants' proposal is not supported by the specification or the prosecution history. The defendants argue that the specification characterizes the tear-wettable surface as "coating" and as a "layer." According to the defendants, this implies that the surface layer is continuous and, therefore, should cover the entire lens body.

This term does not have a technical meaning in the context of this patent and can be understood according to its plain and ordinary meaning. The Court, therefore, declines to construe this term.

### 14.   "Hydroacrylic monomer units"

The plaintiff contends that this phrase should have the same meaning as "hydroxy acrylic monomer units." The defendants propose "a monomer unit having an acrylic moiety and a hydrophilic moiety." The plaintiff argues that this was a term resulted from a typographical error and that one of ordinary skill in the art would understand the phrase as "hydroxy acrylic monomer units." The defendants argue that this term can be understood as being broader than the hydroxy acrylic monomer units because it does not require a hydroxy group. According to the defendants, any error should not be corrected by the court.

The Court agrees with the plaintiff. Reading the term in the context of the patent, one of ordinary skill in the art would understand the term to mean "hydroxy acrylic monomer units." Accordingly, this term has the same construction as "hydroxy acrylic monomer units."

## V.  Conclusion

The Court adopts the constructions set forth in this opinion for the disputed terms of the '327 patent. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

SIGNED this 21st day of May, 2007.

_T. John Ward_
T. JOHN WARD
UNITED STATES DISTRICT JUDGE